881 F.2d 1313
 28 Fed. R. Evid. Serv. 1164
 UNITED STATES of America, Plaintiff-Appellee,
v.
Earl Keith LINDELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Roy McINTOSH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
William E. KINNEAR, II, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Danny M. LOKEN, Defendant-Appellant.
 Nos. 87-2930, 87-6004, 87-6134 and 87-6148.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 17, 1989.
Rehearing Denied Sept. 20, 1989.
 
 Richard V. Dymond, Gulfport, Miss., for Earl Lindell.
 Paul E. Naman, L. Stuart Platt, Asst. U.S. Attys., Bob Wortham, U.S. Atty., Beaumont, Tex., for the U.S.
 Michael L. Baker, Strong, Pipkin, Nelson & Bissell, Beaumont, Tex. (court-appointed), for Charles McIntosh.
 Ernest L. Sample, Beaumont, Tex., for William Kinnear, II.
 Appeals from the United States District Court For the Eastern District of Texas.
 Before GOLDBERG, JOHNSON and DUHE, Circuit Judges.
 DUHE, Circuit Judge:
 
 FACTS AND PROCEDURAL HISTORY
 
 1
 Appellants Earl Keith Lindell, Danny M. Loken, William E. Kinnear, and Charles Roy McIntosh were charged with others in a 35-count indictment for various crimes stemming from a marijuana importation scheme involving several loads of marijuana brought into the United States from 1982 to 1985. In July 1982, Lindell was planning a "controlled" airplane flight bringing drugs into this country in support of an ongoing drug investigation at the direction of the Drug Enforcement Administration ("DEA") and customs officer David Harrison. Prior to the flight, William Carter, an informant working for Harrison, was introduced to Lindell. The conspiracy was born when they agreed to set up a marijuana smuggling operation.
 
 
 2
 The following chronology summarizes the major events that the government alleged comprised the conspiracy:
 
 
 3
 October 1982: Lindell flies in the "control" load for the DEA. He and Carter keep eighty pounds of this marijuana for their own distribution.[1]
 
 
 4
 March 1983: Lindell, Carter, and Harrison[2] team up for the importation of the second load from Mexico. Kinnear helps distribute this load.[3]
 
 
 5
 June 1983: In order to plan future loads Lindell and Carter travel to Belize, Central America, and have discussions with two marijuana suppliers, Badner Hassan and Isaac Dyck.[4]
 
 
 6
 June/July 1983: The third load is imported from Belize by Lindell, Carter, and Hassan. Loken, Lindell and Kinnear distribute this load.[5]
 
 
 7
 November 1983: The fourth load is imported, and is distributed by Lindell, Loken, McDaniel.[6]
 
 
 8
 March 1984: The fifth load is imported. Carter, Lindell, and Loken plan this load, and Kinnear helps distribute it.[7]
 
 
 9
 October 1984: Carter travels to Belize to arrange another marijuana purchase from Badner Hassan and Isaac Dyck. After their meeting, Dyck called Carter to inform him that someone would be sent to collect money for next load.December 1984: Dyck sends McIntosh to Beaumont, Texas, to collect the money owed for the impending load. While in Beaumont, he stays at the Best Western Motel. Carter spoke to McIntosh on several occasions and went to see him at the motel. The load arrived on December 3, 1984.[8] Carter was arrested leaving the airfield after marijuana was loaded onto his truck. After the arrest, McDaniel and William Paul Tinsley[9] went to the Best Western for discussions with McIntosh concerning the load and Carter's arrest.
 
 
 10
 At trial, the government's key witness was William Carter. After his arrest in December 1984 he entered into a plea agreement in exchange for his testimony against the defendants.
 
 
 11
 Appellants appeal their convictions on various grounds. Finding no error, we affirm.
 
 ISSUES ON APPEAL
 I. JOINDER/SEVERANCE
 A. Rule 8(b)
 
 12
 Appellants contend that the indictment was faulty because it joined separate conspiracies into one. Fed.R.Crim.P. 8(b) permits joinder of defendants in the same indictment if the government alleges that they participated "in the same act or transactions constituting an offense or offenses." United States v. Acosta, 763 F.2d 671, 696 (5th Cir.) cert. denied, 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).
 
 
 13
 A charge of conspiracy initially legitimizes joinder of all defendants. Schaffer v. United States, 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960). To determine whether an indictment charges separate conspiracies or a single conspiracy, we consider whether the alleged facts reveal a substantial identity of facts or participants. A single conspiracy can be found when the indictment adequately shows a singular conspiratorial objective, such as a large-scale narcotics transaction. United States v. Metz, 608 F.2d 147, 153 (5th Cir.1979), cert. denied, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). The fact that an indictment does not charge each appellant with active participation in each phase of the conspiracy does not constitute misjoinder. "It is also not necessary that the indictment charge that an appellant 'knew all the participants or details of the conspiracy' as long as it alleges 'knowledge of the conspiracy's essential nature.' " United States v. Acosta, 763 F.2d at 696 (citing Metz, 608 F.2d at 153). "[W]here it is shown that a single 'key man' was involved in and directed illegal activities, while various combinations of other defendants exerted individual efforts toward a common goal, a finding of the existence of a single conspiracy is warranted." United States v. Elam, 678 F.2d 1234, 1246 (5th Cir.1982).
 
 
 14
 Here, count one of the indictment charged all defendants with knowingly conspiring to import marijuana, in violation of 21 U.S.C. Sec. 963, and in count two with knowingly conspiring to distribute and possess marijuana in violation of 21 U.S.C. Sec. 846. Although the overarching conspiracy involved several transactions over a 2 1/2 year period and not all the appellants were involved in all of the transactions, the overlap of the appellants' involvement in various transactions and Lindell and Carter's participation as "key men" supports the government's theory that there was a single overarching conspiracy. Joinder was appropriate.
 
 B. Rule 14
 
 15
 Appellants also contend that the trial court erred by failing to grant any of their numerous severance motions pursuant to Fed.R.Crim.P. 14. Denial of a severance motion is reviewed under the abuse of discretion standard, and a party whose motion was denied can prevail on appeal only on a showing of specific and compelling prejudice, against which the district court was unable to provide protection (with, e.g., limiting instructions) and then, only if the possible prejudice outweighs the public interest in the economy of judicial administration. United States v. Acosta, 763 F.2d at 697.
 
 
 16
 None of the appellants in this case have met this heavy burden. In their briefs they fail to point to any specific instances of compelling prejudice from joinder, and a review of the record reveals that when testimony was not admissible against all defendants the trial court was careful to give a limiting instruction to minimize the possibility of "spillover effect."
 
 
 17
 Additionally, acquittals on some counts as to all the defendants occurred, supporting an inference that the jury sorted the evidence and considered it separately as to the various counts and defendants. United States v. Acosta, 763 F.2d at 697.
 
 II. EVIDENTIARY ISSUES
 A. Cocaine Use
 
 18
 Lindell and Loken contend that it was error to admit over objection evidence that they possessed and used cocaine during the pendency of the conspiracy. The standard of review is abuse of discretion. United States v. Vincent, 681 F.2d 462, 465 (6th Cir.1982).
 
 
 19
 Appellants' personal drug use is admissible under the two part test of United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc ), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). First, it must be determined that the evidence is relevant to an issue other than the defendant's character, and second, the evidence must possess probative value which is not substantially outweighed by its undue prejudice.
 
 
 20
 Knowledge is an essential element of each of the offenses charged. Appellants' cocaine use demonstrated their familiarity with illicit drugs and was therefore relevant on the question of knowledge, and evidence that Loken received cocaine as partial payment for his drug smuggling activities is also relevant to his intent or motive. This satisfies the first part of the Beechum test. United States v. Contreras, 602 F.2d 1237, 1240 (5th Cir.), cert. denied, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979).
 
 
 21
 The second part is also satisfied. Following an evidentiary hearing, the trial court found that the probative value of the cocaine use testimony was not substantially outweighed by its prejudicial effect. This ruling is not an abuse of discretion. Furthermore, danger of undue prejudice was sufficiently mitigated by the trial court's instruction to the jury to consider the evidence only to the extent that it bears on the defendants' knowledge, intent or motive to commit the acts charged in the indictment. Contreras, 602 F.2d at 1240.
 
 B. Confrontation Clause
 
 22
 Kinnear and Lindell contend that their Sixth Amendment right to confront Carter was violated because their attempts to explore the circumstances surrounding Carter's plea bargain agreement were limited by the trial court. However, a review of the record does not reveal any limitations placed on defense counsel during cross-examination of Carter about his plea bargain agreement. The argument is frivolous.
 
 
 23
 C. McIntosh's Prior Conviction and Hearsay Testimony
 
 1. Prior Conviction
 
 24
 McIntosh contends that evidence of his prior conviction for importation of marijuana in February 1986 was improperly admitted, and that the trial court's findings concerning this evidence were insufficient. Since evidence of a prior conviction is extrinsic evidence, we must apply the Beechum probative value/prejudicial effect test.
 
 
 25
 Evidence of previous involvement in marijuana importation was relevant to McIntosh's intent. The similarity of the extrinsic offense to the charged offense, both involving the importation of marijuana, as well as the temporal proximity of the offenses strengthens the relevancy of the prior conviction evidence. United States v. Henthorn, 815 F.2d 304, 308 (5th Cir.1987).
 
 
 26
 The probative value of this evidence outweighed its prejudicial effect. Part of this analysis hinges upon the government's need for this evidence to prove intent. Henthorn, 815 F.2d at 308 (citing Beechum ). In the face of his claim that his presence at the Beaumont Best Western Motel was innocuous, evidence of McIntosh's prior conviction was necessary to support the government's theory that his intent in registering at the hotel was to be able to receive money owed for an incoming shipment of marijuana. See id.
 
 
 27
 McIntosh also contends that the on-the-record Beechum findings made by the trial court were insufficient. Since these findings were made sua sponte by the court, we need not evaluate their sufficiency.[10] See United States v. Zabaneh, 837 F.2d 1249, 1264 (5th Cir.1988) (on request of a party, the trial court must identify and weigh the potentially prejudicial effect of the proffered evidence); United States v. Robinson, 700 F.2d 205, 213 (5th Cir.1983), cert. denied, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984) (on-the-record Beechum findings only required when requested by a party).
 
 2. Carter's Testimony
 
 28
 Carter testified about a conversation that he had with Isaac Dyck in Belize while negotiating one of the smuggling deals in which Dyck volunteered that McIntosh told him that McIntosh was a "smuggler pilot." This testimony was admitted under the co-conspirator hearsay exception, Fed.R.Evid. 801(d)(2)(E), which allows statements of co-conspirators made in furtherance of the conspiracy. McIntosh argues that any comments he made to Dyck about being a "smuggler pilot" were not made in furtherance of the conspiracy, since he is accused of being the bagman in the operation, not the pilot. We disagree. In United States v. James, 510 F.2d 546, 549 (5th Cir.), cert. denied, 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975), we noted that although the phrase "in furtherance of the conspiracy" has a talismanic ring to it, it must not be applied too strictly or the purpose of the exception would be defeated. United States v. Patton, 594 F.2d 444, 447 (5th Cir.1979); See also, E. Cleary, McCormick On Evidence 793 (3rd ed.1984) (literally applied, the "in furtherance" requirement calls for general exclusion of statements possessing evidential value solely as admissions, yet in fact more emphasis seems to be placed upon the "during continuation" aspect and any statement so qualifying in point of time may be admitted in evidence without much regard to whether it in fact furthered the conspiracy) (citing United States v. Patton)).
 
 
 29
 The statement here was made by one conspirator to a fellow conspirator identifying yet another conspirator. From this statement by Dyck, Carter could infer that McIntosh was someone who could be trusted in a drug smuggling operation, and it is probative in light of McIntosh's later participation as bagman for Dyck.
 
 
 30
 McIntosh also argues that the "smuggler pilot" testimony was used as an improper basis for the admission of other hearsay testimony, but he fails to point to the other evidence that was improperly admitted. Moreover, while the "smuggler pilot" testimony could have been properly considered by the trial court in determining the admissability of other hearsay statements, Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 2780-81, 97 L.Ed.2d 144 (1987), there was also other evidence independent of this testimony linking McIntosh to the conspiracy that could have formed the basis for admitting other hearsay testimony.
 
 III. ALLEN CHARGE
 
 31
 Appellants contend that the trial court's use of the Allen charge contributed to a coerced verdict.[11] The standard of review is abuse of discretion. United States v. Nichols, 750 F.2d 1260, 1266 (5th Cir.1985). This Court must scrutinize the Allen charge for compliance with two requirements: "(1) the semantic deviation from approved 'Allen' charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved 'Allen' charge must not be coercive." United States v. Bottom, 638 F.2d 781, 787 (5th Cir.1981) (citing United States v. Bailey, 468 F.2d 652 (5th Cir.1972), aff'd en banc, 480 F.2d 518 (5th Cir.1973)).
 
 
 32
 The charge used by the trial court meets the first criteria; it comports with modified Allen charge language repeatedly approved by this Court.[12] See, e.g., United States v. Kelly, 783 F.2d 575, 576-77 (5th Cir.), cert. denied, 479 U.S. 889, 107 S.Ct. 288, 93 L.Ed.2d 262 (1986); United States v. Anderton, 679 F.2d 1199, 1203 n. 3 (5th Cir.1982); United States v. Bottom, 638 F.2d at 786.
 
 
 33
 In evaluating the "totality of the circumstances" surrounding the use of the charge, we proceed on a case by case basis. United States v. Fossler, 597 F.2d 478, 485 (5th Cir.1979). In this case, the jury retired to deliberate on a Friday morning. At 12:25 p.m., the jury sent the court note number one[13] stating they were "deadlocked." At 2:12 p.m., the jury sent note number two stating that "[w]e are hopelessly deadlocked with no hope of unanimous decision." At 2:30 p.m., the court gave the jury the modified Allen charge. At 2:58 p.m., the jury sent note number three stating that "due to very strong personal convictions we are still hopelessly deadlocked. No hope of a unanimous decision." At 3:57 p.m., the court instructed the jury to review all of its instructions and continue to deliberate. At 5:00 p.m., the jury sent note number four stating that there was "no hope!" They were subsequently excused for the weekend.
 
 
 34
 The jury returned on Monday morning and continued to deliberate until 11:28 a.m. on Tuesday, when they sent a note stating that "Even though we do not have unanimous decisions on all counts, we are at a point where any more deliberation would be completely fruitless." The trial court did not require any further deliberations and accepted a partial verdict on Tuesday afternoon. The jury returned 14 guilty verdicts, nine not guilty verdicts, and was deadlocked on 11 counts. During deliberations, repeated motions were made by the appellants for a mistrial.
 
 
 35
 We find that the trial court's use of the Allen charge was reasonable under the circumstances. In light of the three week trial and the numerous counts against the defendants in the context of a sophisticated drug importation scheme, the trial court was within the bounds of its discretion in refusing to declare a mistrial after receiving the deadlock notes on the first day of deliberations. See United States v. Garcia, 732 F.2d 1221, 1227 (5th Cir.1984) (Allen charge given after second deadlock note on first day of deliberations, guilty verdict returned same afternoon).
 
 
 36
 Other circumstances surrounding the verdict lead us to conclude that the jury was not coerced: 1) after resuming deliberations on Monday, there were no more "deadlock" notes prior to the partial verdict; 2) the verdict was a discriminating one, see United States v. Foster, 711 F.2d 871, 884 (9th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984);[14] 3) the trial judge did not inquire into the numerical division of the jury, Brasfield v. United States, 272 U.S. 448, 449-50, 47 S.Ct. 135, 136, 71 L.Ed. 345 (1926); 4) no deadline was set for the jury's decision; and 5) the verdict was returned two days after the Allen charge was given. See United States v. Bottom, 638 F.2d at 788 (three hour time span between Allen charge and verdict was not unduly short).
 
 IV. SUFFICIENCY OF THE EVIDENCE
 
 37
 In considering a claim of insufficient evidence, we must decide whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (en banc ), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "In doing so, we must view the evidence and the inferences that may be drawn from it in the light most favorable to the jury verdict." United States v. Stanley, 765 F.2d 1224, 1240 (5th Cir.1985) (citations omitted).
 
 
 38
 A. Possession with Intent to Distribute Marijuana
 
 
 39
 McIntosh and Loken contend that there is insufficient evidence to sustain their convictions for possession of marijuana with intent to distribute and aiding and abetting possession of marijuana with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. In order to obtain a conviction for possession with intent to distribute, the government must prove three elements: (1) knowing (2) possession of marijuana (3) with intent to distribute it. United States v. Vergara, 687 F.2d 57, 61 (5th Cir.1982); United States v. Richards, 638 F.2d 765, 768 (5th Cir.), cert. denied, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). Possession may be either actual or constructive and may be joint among several defendants. Vergara, 687 F.2d at 61.
 
 1. Loken
 
 40
 Loken's conviction for possession with intent to distribute marijuana was based on Carter's testimony that Loken received compensation for transporting to Minnesota and selling 100 pounds of the July 1983 load. This is sufficient evidence to sustain the conviction.
 
 
 41
 Loken contends that his conviction should be reversed because of inconsistencies in Carter's testimony. When Carter first testified about the July 1983 load he did not mention Loken's participation, and it was only after further questioning by the government that Loken was implicated.
 
 
 42
 The jury is the ultimate arbiter of the credibility of a witness, United States v. Cravero, 530 F.2d 666, 670 (5th Cir.1976), and uncorroborated testimony of an accomplice is sufficient evidence on which to base a conviction. United States v. Carrasco, 830 F.2d 41, 44 (5th Cir.1987). Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law. Id.; United States v. Palacios, 612 F.2d 972, 973 (5th Cir.1980). Carter's testimony is not unbelievable.
 
 2. McIntosh
 
 43
 McIntosh was charged with possession with intent to distribute marijuana and in the same count with aiding and abetting possession with intent to distribute marijuana. The evidence and arguments make it clear that McIntosh's conviction on this count rests on the conclusion that he aided and abetted possession with intent to distribute.
 
 
 44
 To be convicted for aiding and abetting possession of marijuana with intent to distribute, there must be evidence connecting the defendant with both the possession and the distribution aspects of the crime. United States v. Longoria, 569 F.2d 422, 424-25 (5th Cir.1978); United States v. Hernandez-Beltran, 867 F.2d 224 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 2439, 104 L.Ed.2d 995 (1989); United States v. Natel, 812 F.2d 937, 941 (5th Cir.1987). The government had to show that McIntosh willfully "associated with the criminal venture, participated in it as something he wished to bring about, and sought by his action to make it succeed." United States v. Payne, 750 F.2d 844, 860 (11th Cir.1985) (citations omitted); United States v. Richardson, 764 F.2d 1514, 1525 (11th Cir.), cert. denied, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985). To prove association, the evidence must show that the defendant shared the criminal intent of the principal. To prove participation, the evidence must show that the defendant committed an overt act that assisted in the success of the venture. Id. Mere presence and association alone are insufficient to sustain a conviction for aiding and abetting, however, they are factors to be considered. U.S. v. Natel, 812 F.2d at 941.
 
 
 45
 McIntosh travelled to Beaumont, Texas in December 1983 to collect money for Isaac Dyck, the Belize supplier of the November 1983 load.[15] While in Beaumont, McIntosh met with Carter, Tinsley, and McDaniel and discussed payment for the marijuana and other aspects of the smuggling operation.[16] This evidence shows that McIntosh had the requisite intent and by his actions facilitated the possession by others of marijuana with the intent to distribute. This contributed towards the completion of the smuggling operation, albeit an unsuccessful one. See id. at 941-42.
 
 B. McIntosh's Importation Conviction
 
 46
 McIntosh was convicted for importation and aiding and abetting importation in violation of 21 U.S.C. Sec. 952(a) and 18 U.S.C. Sec. 2.
 
 
 47
 A conviction for importation requires proof of elements similar to the elements of possession with intent to distribute plus proof that the defendant played a role in bringing the marijuana from a foreign country into the United States. United States v. Cardenas Alvarado, 806 F.2d 566, 570 (5th Cir.1986); see United States v. Jonas, 639 F.2d 200, 205 (5th Cir.1981).
 
 
 48
 Since the government has presented no evidence that shows that McIntosh directly participated in importation, his conviction can only stand on a finding that he aided or abetted importation. The same evidence that McIntosh acted as Isaac Dyck's bagman for the December 1984 load that supports his conviction for aiding and abetting possession with intent to distribute is adequate participation in the venture to support his conviction under this count.[17]
 
 C. Conspiracy Convictions
 
 49
 Loken and Kinnear contend that there is insufficient evidence to sustain their convictions for conspiracy to distribute and possess with the intent to distribute in violation of 21 U.S.C. Sec. 846. To sustain a conspiracy conviction, "[k]nowledge, intent, and participation, the essential elements of the crime, must be proved beyond a reasonable doubt." United States v. Basey, 816 F.2d 980, 1002 (5th Cir.1987) (citations omitted). The agreement to join the conspiracy need not be proved by direct evidence, but may be inferred from concert of action. United States v. Dean, 666 F.2d 174, 178 (5th Cir.), cert. denied, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, and cert. denied, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982).
 
 
 50
 Loken's conviction is supported by Carter's testimony that Loken along with others distributed the July 1983, November 1983, and March 1984 loads. Kinnear's conspiracy conviction is supported by evidence showing that he invested in several marijuana loads and that he helped distribute marijuana over a three year period. This evidence is sufficient to show knowledge, intent, and participation.
 
 V. DISPROPORTIONATE SENTENCES
 
 51
 Lindell and McIntosh complain that their sentences are disproportionate and constitute cruel and unusual punishment.[18] A strict standard of review applies to a trial court's sentencing decisions. United States v. Robinson, 700 F.2d at 214. A sentence within the statutory limits is generally not subject to appellate review, United States v. Castillo-Roman, 774 F.2d 1280, 1283 (5th Cir.1985), and the defendant bears the burden of proving that there was an arbitrary and capricious abuse of discretion by the sentencing court. United States v. Cimino, 659 F.2d 535, 537 (5th Cir.1981).
 
 
 52
 For his two convictions, McIntosh received two concurrent 15 year sentences, two $25,000 fines, and two four year special probation terms. For his five convictions, Lindell received a 25 year sentence, $60,000 in fines, and a six year special probation term.
 
 
 53
 They first point to lesser sentences received by others convicted for their participation in the conspiracy. A defendant cannot rely upon his codefendants' sentences as a yard-stick for his own. United States v. Hayes, 589 F.2d 811, 827 (5th Cir.), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). A mere disparity of sentences among codefendants does not, alone, constitute abuse of discretion. United States v. Castillo-Roman, 774 F.2d at 1283. Moreover, even if we were to compare the sentences received by other coconspirators to those received by McIntosh and Lindell, the disparity is not so large as to support a constitutional attack.[19] Rodriquez v. United States, 394 F.2d 825, 826 (5th Cir.1968).
 
 
 54
 McIntosh also contends that his prior drug-related conviction should have had little weight in the trial court's sentencing determination because it was for a crime committed subsequent to the events for which he was convicted at trial. Although there is no indication that this conviction was considered at all, the trial court could have properly done so. See United States v. Cimino, 659 F.2d at 538.
 
 
 55
 McIntosh's contention that his sentence reflects punishment for going to trial also misses the mark. While the coconspirators who pled guilty and testified at trial received lesser sentences than McIntosh, cooperation with the government could have played a legitimate role in these sentences. United States v. Nichols, 695 F.2d 86, 93 (5th Cir.1982).
 
 
 56
 Turning specifically to Lindell, the evidence showed that he was a "key man" in the conspiracy, thus fully justifying his sentence. Id. at 94.
 
 VI. MISCELLANEOUS ISSUES
 A. Kinnear
 1. Abandoned Claims
 
 57
 Fed.R.App.P. 28(a)(4) requires that the argument section of a litigant's brief contain the "contentions of the appellant with respect to the issues presented, and the reasons therefor, with citation to the authorities, statutes and part of the record relied on." Kinnear raises several points of error that are not properly argued in his brief, thus we treat them as abandoned.[20] See Tedder v. F.M.C. Corp., 590 F.2d 115, 117 (5th Cir.1979); Davis v. Hill Engineering, Inc., 549 F.2d 314, 324 (5th Cir.1977).
 
 2. Jencks Material
 
 58
 Kinnear contends that the Jencks Act requires that he should have been given access to notes taken by government agents while interviewing Carter. The Jencks Act requires production, upon motion of the defendant, of any statement, as defined by the Act, within the scope of the subject matter of the direct examination of a government witness who has testified. 18 U.S.C. Sec. 3500(b). "Statement" is defined as:
 
 
 59
 (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
 
 
 60
 (2) a ... recording, or transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously. Id. at Sec. 3500(e)(1), (2).
 
 
 61
 Kinnear relies on United States v. Welch, 810 F.2d 485 (5th Cir.), cert. denied, 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), where this Court held that a government agent's investigative reports compiled from personal observations and interviews of witnesses can constitute his own statement for the purposes of the Jencks Act and should be produced when the agent testifies. Kinnear, however, does not seek the notes because he considers them statements of the agents, but because he considers them statements of Carter. Since Carter did not sign or otherwise approve the notes, nor were the notes alleged to be a substantially verbatim recital of the numerous interviews of Carter, they are not discoverable. Id.; United States v. Cole, 617 F.2d 151, 153 (5th Cir.1980).
 
 3. Prosecutorial Misconduct
 
 62
 Kinnear complains that the prosecution failed to provide him with government witness DuPuy's polygraph examination results prior to DuPuy's trial testimony.
 
 
 63
 A defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and "material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). In addition to exculpatory evidence, the Brady rule covers evidence that might be used for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Impeachment evidence includes the results of a polygraph test. Carter v. Rafferty, 826 F.2d 1299, 1305 (3rd Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988).
 
 
 64
 The materiality test is only met if "[t]here is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Kinnear fails to satisfy this test. Even though the government provided him with DuPuy's polygraph test results at a post-trial hearing, Kinnear fails to point to specific trial testimony that could have been impeached by the results of the polygraph test, nor does he demonstrate that the result of the trial would have been different if he was in possession of this report prior to trial.[21]
 
 4. Bill of Particulars
 
 65
 Kinnear filed a motion for a bill of particulars on three occasions. Before the first motion was considered, the government filed its first superceding indictment. The second and third motions were denied.
 
 
 66
 "Denial of a motion for a bill of particulars is reviewable on appeal from a judgment of conviction, but the judgement will be reversed only if there is a showing of a clear abuse of discretion." United States v. Vasquez, 867 F.2d 872, 874 (5th Cir.1989) (citations omitted). "[T]he accused must show that he was actually surprised at trial and that his rights were substantially prejudiced by the denial." Id. Kinnear does not meet this burden. In support of his contention he merely states that a bill of particulars would have helped him in his trial preparation, but does not allege surprise or prejudice.
 
 B. McIntosh Conspiracy Counts
 
 67
 McIntosh contends that the denial of his motion for judgment of acquittal was error. Since we have already found that the evidence supports McIntosh's conviction on two substantive counts, we only need to consider this argument in regard to the two conspiracy counts against him.[22]
 
 
 68
 The standard of review with respect to a Rule 29(a) motion is whether "viewing the evidence presented most favorable to the Government, a reasonable minded juror could accept the relevant and admissible evidence as [adequate] and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. United States v. Slovacek, 867 F.2d 842, 845 (5th Cir.1989).
 
 
 69
 In support of the conspiracy counts, the Government relied on the same evidence that we find sufficient to support his importation and possession with intent to distribute convictions. McIntosh contends that this evidence did not show that he made an agreement with anyone or had knowledge of an agreement between anyone to import, possess, or distribute marijuana.
 
 
 70
 The evidence of McIntosh's presence in Beaumont in December 1984 and his discussions with coconspirators about the importation of marijuana, when viewed most favorably to the government, could support a conspiracy conviction.[23] The conspiracy counts properly went to the jury.
 
 C. Loken Cumulative Error
 
 71
 Loken argues that the cumulative effect of the errors committed requires reversal. Although the "cumulative effect of several incidents ... may require reversal, even though no single one ... considered alone would warrant such a result," United States v. Canales, 744 F.2d 413, 430 (5th Cir.1984), this situation is a rarity. United States v. Iredia, 866 F.2d 114, 118 (5th Cir.1989). Here, not finding any merit to the other contentions raised by Loken, we likewise do not find that their cumulative effect is sufficient to form a basis for reversal.
 
 CONCLUSION
 
 72
 The judgment of the district is AFFIRMED.
 
 
 
 [1]
 The jury could not reach a verdict on the counts involving this load
 
 
 [2]
 Harrison was named in the original and first superceding indictments for his participation in the conspiracy, but not in the second superceding indictment. The final disposition of the charges against him are not part of the record on appeal
 
 
 [3]
 Lindell was convicted for importation of this load
 
 
 [4]
 Hassan was indicted for his participation in the smuggling operation but was never apprehended. Dyck is believed to be dead. Lindell was convicted for a violation of the "Travel Act," 18 U.S.C. Sec. 1952, for this Central American sojourn
 
 
 [5]
 Lindell was convicted for importation of this load and, along with Loken and Kinnear, for possession with intent to distribute
 
 
 [6]
 McDaniel was named in eleven counts of the indictment. He reached a plea agreement and testified for the government at trial. The only conviction stemming from this load was Kinnear's for possession with intent to distribute
 
 
 [7]
 The only conviction stemming from this load was Kinnear's for possession with intent to distribute
 
 
 [8]
 Kinnear and McIntosh were found guilty of importation and McIntosh was found guilty of possession with intent to distribute this load
 
 
 [9]
 Tinsley was named in six counts of the indictment. He reached a plea agreement and testified for the government at trial
 
 
 [10]
 The finding made was: "I am going to admit [McIntosh's conviction] and I find that the extrinsic offense in that judgment requires the same intent as charged in the offense upon which he is in trial and that the jury could find, since there has been a transcript offered to me in camera of the supporting finding of fact in connection with that [guilty plea], that the defendant committed the extrinsic offense. And I further find that the incremental probative value of the extrinsic offense evidence is not substantially outweighed by the danger of unfair prejudice to the defendant
 
 
 [11]
 The term "Allen charge" is used in reference to supplemental instructions urging a jury to forego their differences and come to a unanimous decision
 
 
 [12]
 The Allen charge given is found in the Fifth Circuit Pattern Jury Instructions for Criminal Cases (1979)
 We decline the appellants' suggestions to follow the "modern judicial trend curtailing the use of the Allen charge." See, e.g., United States v. Rey, 811 F.2d 1453, 1458 (11th Cir.), cert. denied, 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987). Even if we were inclined to do so, unless sitting en banc we are bound by this Court's repeated approval of the use of the modified Allen charge.
 
 
 [13]
 In addition to the notes sent pertinent to this discussion, the jury sent other notes throughout their deliberations concerning evidentiary items
 
 
 [14]
 The discriminating verdict demonstrates the appellants misplaced reliance on United States v. Arpan, 861 F.2d 1073 (8th Cir.1988), reh'g en banc granted, 867 F.2d 1188 (1989). Since rehearing en banc has been granted, the panel opinion is vacated and of dubious precedential value. Nevertheless, it is distinguishable. In Arpan, the Court found that the verdict was coerced. In response to notes inquiring as to what it should do if it cannot reach a unanimous decision, the trial court twice instructed the jury that a verdict may not be returned as to any count in the indictment unless it was unanimous. Id. at 1075-77. The jury subsequently reached a verdict on all eight counts of the indictment. Finding that this sort of jury instruction impermissibly precluded the "option of a hung jury," the convictions were overturned. Id. at 1077. No such complaint can be made here. In the 34 count indictment, the jury was deadlocked on 11 counts
 
 
 [15]
 On this point, Carter testified about a conversation he had with Isaac Dyck as follows:
 Q. And what was the nature of the discussion?
 A. At that time I didn't have a lot of money to put for a down payment on the 1500 pounds the Navajo was going to bring back but Isaac [Dyck] still wanted to front it to me and Mr. McIntosh was going to be in Beaumont to pick up the monies as we sold the marijuana that were owed to Isaac.
 Q. Who told you that?
 A. Isaac Dyck.
 
 
 [16]
 The government presented testimony from three co-conspirators concerning their meetings with McIntosh. Carter testified as follows:
 Q. Do you know where he was staying?
 A. I saw him at the Best Western on 11th Street.
 Q. What was the purpose of you seeing him on that occasion?
 A. He told me what his purpose was for being there, which I already knew because I had talked to Isaac [Dyck].
 Q. What did Mr. McIntosh say?
 A. He was there to collect the money.
 McDaniel testified as follows:
 Q. And when you went to [the] Best Western, did you go to see--go to a specific place at the Best Western?
 A. Yes.
 Q. Where was that?
 * * *
 A. To room 106.
 * * *
 Q. Did you go alone or did you go with somebody else?
 A. I went with Bill Tinsley.
 * * *
 Q. And what did you talk about?
 A. I just explained what happened out there at the air strip and showed him the paper clipping that was in the newspaper about the [November 1983 smuggling incident,] and I was there about five minutes and then I left.
 Q. Well, did he say anything to you?
 A. He just wanted to know, you know, what happened out there.
 * * *
 Q. And who was this man in Room 106 at the Best Western?
 A. It was Roy McIntosh.
 Tinsley testified as follows:
 Q. Will you tell us what happened when you went in the room with Roy McIntosh and Bruce [McDaniel]?
 A. Bruce and Roy were talking ...
 (After hearsay objections by defense counsel, Tinsley continued:)
 I don't remember the exact words but, like I said, what I got out of it was that they were discussing what took place and what they felt like they should do with the airplane.
 * * *
 Q. Did you get anything else out of the conversation?
 (After an objection by defense counsel, Tinsley responded:)
 A. Okay. It was my understanding that Bruce was explaining to Roy what took place and Roy was supposed to call somebody to tell them. I think Roy was supposed to get some money. That was my understanding.
 Q. Roy was supposed to call somebody and tell them?
 A. Yes, somebody in Belize, I understand.
 
 
 [17]
 See notes 15 and 16 for testimony supporting the conviction
 
 
 [18]
 Pursuant to Fed.R.App.P. 28(i), Lindell adopts McIntosh's argument on this issue
 
 
 [19]
 In his brief, McIntosh points to the sentences of three co-conspirators in support of this argument
 McDaniel pled guilty to possession with intent to distribute marijuana and knowingly using a communication facility to facilitate the commission of a felony. He was sentenced to concurrent sentences of five and three years. Tinsley pled guilty to a distribution charge and was sentenced to five years. Both McDaniel and Tinsley entered into a plea agreement with the government and testified at trial.
 Kinnear was found guilty of conspiracy to possess with intent to distribute and possession with intent to distribute. He was sentenced to ten years imprisonment and received a $25,000 fine.
 
 
 [20]
 The issues that we consider abandoned are:
 Point 4: The trial court erred when it sustained an objection during Kinnear's closing argument when he made reference to Carter's omission of any mention of Kinnear to the Grand Jury.
 Point 8: The trial court erred in denying Kinnear's discovery motion requesting the identity of individuals with whom he was alleged to have distributed marijuana, conspired with, and received marijuana, and the date, place and circumstances of the alleged drug activities.
 Point 9: The trial court erred in denying Kinnear's motion for judgment of acquittal, or in the alternative, in failing to dismiss the conspiracy counts. This point is moot in regard to count two, conspiracy to distribute, in light of our holding that the evidence was sufficient to sustain his conviction.
 Point 12 and 13: The trial court erred in denying Kinnear's motion for a new trial.
 
 
 [21]
 Kinnear also notes that no Brady material was provided concerning DEA agent Harrison, but does not allege that the government possessed Brady material relating to Harrison or that if it did it would satisfy the materiality test
 
 
 [22]
 In count one, McIntosh was charged with conspiring to import marijuana. In count two, McIntosh was charged with conspiring to distribute and possession with intent to distribute marijuana
 
 
 [23]
 See notes 15 and 16 for testimony supporting the conspiracy charge